UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,             CRIMINAL NO. 15-20023

v.                                  HON. MARK A. GOLDSMITH

JERMAINE SHUMATE,

               Defendant.

_____/

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

The defendant, Jermaine Shumate, has served less than one year of a nine-year sentence for conspiring to distribute heroin. He does not have any CDC risk factors for risk of severe illness from Covid-19. He nonetheless filed a motion for compassionate release. But he has not even made this request to the Bureau of Prisons. So his motion should be denied because he has not exhausted his administrative remedies. In any case, given his age and health, compassionate release is not appropriate.

## Background

Shumate was sending large quantities of heroin through the mail. (PSR, ¶ 7). DEA caught on and made controlled purchases of drugs from him. (*Id.*, ¶ 8). In January 2015, they searched his house and found more heroin, kilogram packaging materials, assault-style firearms, and a large amount of cash. (*Id.*).

Shumate was charged with conspiring to distribute heroin. (PSR, ¶ 1). He eventually pleaded guilty without a plea agreement. (*Id.*, ¶ 4). His sentencing guideline range was 292-365 months. (PSR ¶ 50). And the Court sentenced him to nine years in prison.

Shumate began serving that prison sentence on May 30, 2019. He is currently at Butner Low FCI in Butner, North Carolina. (Butner Low FCI has, as of May 15, 2020, 23 inmates and 3 staff members who have tested positive for Covid-19. There have also been 38 inmates and 4 staff members that have fully recovered.) His projected release date is March 22, 2027. So, he has served roughly 10% of his sentence.

Prior to sentencing, Shumate reported to probation that he was "in good physical health." (PSR, ¶ 41). On May 14, 2020 (or one day *after* he filed his motion), Shumate had a medical visit and reported a history of

asthma. (Exhibit 1 – Clinical Encounter on 5/14/20, sealed). Shumate

noted that he had been without an inhaler since 2019. (*Id.*). The

medical provider ultimately diagnosed him with "intermittent" asthma.

(*Id.*).

   Shumate filed a motion for compassionate release on May 13, 2020.

(R.45: Motion). He has not, however, made an administrative request to

the BOP seeking this remedy.

## Argument

## I.   The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A.   The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's

spread within its facilities. For over almost a decade, the Bureau of

Prisons has maintained a detailed protocol for responding to a

pandemic. Consistent with that protocol, the Bureau of Prisons began

planning for Covid-19 in January 2020.

   On March 13, 2020, the Bureau of Prisons began modifying its

operations to implement its Covid-19 Action Plan and minimize the risk

of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19

Modified Operations Website. Since then, as the worldwide crisis has

evolved, the Bureau of Prisons has repeatedly revised its plan. The
current plan, which is in effect until May 18, 2020, requires that
inmates in every institution be secured in their assigned cells or
quarters for at least 14 days to stop the spread of the disease. Only
limited group gathering is allowed, and social distancing is maximized.
Staff and inmates are issued face masks to wear in public areas. *See*
BOP FAQs: Correcting Myths and Misinformation. And the movement
of inmates and detainees between facilities is severely restricted, with
exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors
and symptoms. Asymptomatic inmates with risk of exposure are placed
in quarantine for a minimum of 14 days or until cleared by medical
staff. Symptomatic inmates are provided with medical evaluation and
treatment and are isolated from other inmates until testing negative for
Covid-19 or being cleared by medical staff under the CDC's criteria. In
areas with sustained community transmission, all staff are screened for
symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit
or higher are barred from the facility on that basis alone. A staff

member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.      The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2,549 federal inmates have been granted home confinement since

the Covid-19 pandemic began, and that number continues to grow. BOP
Coronavirus FAQs. As the Attorney General's directives have explained,
these home-confinement decisions have required evaluating several
criteria:

>     1.) Each inmate's age and vulnerability to Covid-19;
>
>     2.) Whether home confinement would increase or decrease
>     the inmate's risk of contracting Covid-19; and
>
>     3.) Whether the inmate's release into home confinement
>     would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the
Covid-19 pandemic far better than any other solution does. The Bureau
of Prisons cannot open its facilities' gates indiscriminately and unleash
tens of thousands of convicted criminals, en masse. It must focus on the
inmates who have the highest risk factors for Covid-19 and are least
likely to engage in new criminal activity. This is true not just to protect
the public generally, but to avoid the risk that a released defendant will
bring Covid-19 back into the jail or prison system if he violates his
terms of release or is caught committing a new crime. *See* 18 U.S.C.
§ 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-

confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-

19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should not grant Shumate compassionate release.

The Court should not grant Shumate's motion for compassionate release. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those

statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a

defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. The Court is barred from granting release because Shumate has not exhausted his administrative remedies.

The Court must dismiss Shumate's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First

Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

13

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c)'s requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement.

14

Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those decisions has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360, at *2–*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with even greater force during the COVID-19 pandemic. The Bureau of Prisons is already responding to the pandemic—not just through heightened safety measures, but by evaluating its entire prison

population for home confinement. By requiring a defendant to exhaust, § 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather his medical documentation and other records, evaluate his request, and decide in the first instance whether it justifies either compassionate release or some other form of relief. As the Third Circuit observed: "Given BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597.

Shumate did not exhaust his administrative remedies. His motion should therefore be dismissed.

## B.   There are no extraordinary and compelling reasons to grant Shumate compassionate release.

Even if Shumate had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits

"extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Shumate claims that he has "severe asthma." (R.45: Motion, 151). But he is not eligible for compassionate release on this basis. *See, e.g.*, USSG § 1B1.13 cmt. n.1(A)(i) (defendant may be released in certain cases where suffering from a "terminal illness") and *id.* (A)(ii) (defendant suffering from condition that "substantially diminishes" defendant's ability to provide self-care and which he is not expected to recover from). At 45, he is a relatively young man who is otherwise healthy. He even recently explained to the BOP medical provider that he has been dealing with his asthma without an inhaler since 2019.

The Covid-19 pandemic should not alter this analysis. Even assuming, in other cases, that a defendant's risk from Covid-19 might

make the difference in his eligibility for release under § 1B1.13,
Shumate's circumstances do not satisfy that standard. He does not have
any of the [CDC risk factors for higher risk for severe illness](#) if he
contracts Covid-19. [CDC does list "moderate to severe asthma"](#) as a risk
factor. There are different [classifications of asthma](#), from intermittent
to severe. As explained above, Shumate was recently diagnosed with
the "intermittent" asthma—the mildest form. In other words, even with
asthma, Shumate is not at a higher risk for severe illness if he contracts
Covid-19.

Nor does the Covid-19 pandemic by itself qualify as the type of
inmate-specific reason permitting compassionate release. As the Third
Circuit explained, "the mere existence of Covid-19 in society and the
possibility that it may spread to a particular prison alone cannot
independently justify compassionate release, especially considering
BOP's statutory role, and its extensive and professional efforts to curtail
the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has
worked diligently to implement precautionary measures reducing the
risk from Covid-19 to Shumate and other inmates. Nothing in the

statute or USSG § 1B1.13 supports an unbounded interpretation of § 3582(c)(1)(A). *See Raia*, 954 F.3d at 597.

Shumate is not eligible for compassionate release.

### C. The factors in 18 U.S.C. § 3553(a) weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. So even if the Court were to find Shumate eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Shumate was involved in a dangerous criminal activity that injected poison into the community. He was in possession of two assault style firearms at the time of his arrest. Besides this case, he has a history of drug trafficking. And he has served less than one year of his nine year sentence.

III.   **If the Court were to grant Shumate's request, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Shumate's family's request despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

The Court should deny Shumate's request for compassionate release.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/ Steven P. Cares
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9139
Dated: May 18, 2020      Email: steven.cares@usdoj.gov

Certificate of Service

I certify that on May 18, 2020, I electronically filed this motion for the United States with the Clerk of the United States District Court for the Eastern District of Michigan using the ECF system, which will send notification of such filing to the following:

Steven Scharg

I further certify that I have mailed by U.S. mail the Government's response to the following non-ECF participant:

n/a

/s/ Steven P. Cares
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9139
Email: steven.cares@usdoj.gov